**PAY'N SAVE CORPORATION,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–7120.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 9, 1981.

Decided March 9, 1981.

Michael R. Rayton, Ryan, Swanson, Hendel & Cleveland, Seattle, Wash., for petitioner.

Kenneth Hipp, Washington, D.C., argued for respondent; Charles P. Donnelly, Washington, D.C., on brief.

Before PREGERSON, POOLE and NOR-RIS, Circuit Judges.

PREGERSON, Circuit Judge:

Pay'n Save Corporation, engaged in retailing goods to the public, petitions this court to review and set aside an order of the National Labor Relations Board (NLRB); the NLRB cross-applies for enforcement of its order. The contested order was based on the NLRB's finding that Pay'n Save had violated subsections 8(a)(1) and (3) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1) and (3),[1] by maintaining and disparately applying an unwritten rule against wearing "controversial" buttons, including union buttons, and by suspending and later discharging two employees for engaging in protected union activities. The alleged violations took place during a union organizing campaign. The NLRB's order required Pay'n Save to recognize and bargain with the union and to cease and desist from interfering with employees' exercise of protected rights, to offer reinstatement and backpay to the discharged employees, and to post an appropriate notice.

Pay'n Save contends that its prohibition of controversial buttons was a justified business decision taken to avoid antagonizing customers, that the two employees were legitimately discharged for insubordination, and that the circumstances of this case do not justify the issuance of a bargaining order. Pay'n Save also challenges two evidentiary rulings made by the administrative law judge (ALJ) in the hearing on the unfair labor practice charges.

Because we find that the NLRB's findings of fact are supported by substantial evidence on the record as a whole, and that the NLRB correctly applied the law, we deny Pay'n Save's petition and enforce the NLRB's order.

## I. FACTS

The instant dispute arose in May 1978, during an organizational campaign by the Retail Clerks Union Local No. 381 (Union) at Pay'n Save's Port Angeles, Washington, store. Dawn Frederick, a Pay'n Save sales clerk, contacted the Union in early May, obtained union authorization cards, and distributed them to other store employees. Ten of the thirteen employees signed cards.

At a May 15, 1978 meeting with Pay'n Save employees, a Union representative distributed yellow and black lapel buttons, 1¼ inch in diameter, some saying "Vote Yes Retail Clerks Union AFL–CIO" and others "Vote Retail Clerks Union AFL–CIO." That day and the next day, Frederick and fellow employee Joyce Berry wore the union buttons on their company-issued jackets while on the store sales floor.[2] On May 17, Assistant Store Manager Gary Jennings directed Frederick and Berry to remove the buttons; they refused, and Jennings suspended them. Later that afternoon, Store Manager Jim Hanrahan telephoned Frederick and Berry and told them they would be discharged by May 19 unless they returned to work without the buttons. Frederick telephoned Hanrahan a few minutes later, asked whether she could wear the button on her own clothing rather than on the store jacket, and was told she could. She and Berry both wore the buttons on their personal clothing when they returned to work.

On May 27, Frederick and Berry each wore a union button on their store jackets. (Berry wore an additional button on her

1. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7" of the Act. (Section 7 appears, in relevant part, in note 5 *infra*.) Subsection 8(a)(3), in relevant part, makes it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

2. Each Pay'n Save employee is issued a store jacket. The women's store jacket is a bright orange, hip-length smock.

personal clothing.) Hanrahan called them into his office one at a time and discharged them. Although there is conflicting testimony as to exactly what was said, it is clear that Hanrahan withdrew the option of wearing the union button on personal clothing, and made it clear that the buttons were not to be worn on the sales floor at all.

After a hearing, an ALJ found that Pay'n Save had violated subsections 8(a)(1) and (3) of the Act by suspending and discharging Frederick and Berry, and ordered reinstatement and backpay as a remedy. The NLRB substantially affirmed the ALJ's findings, but reversed the finding that Pay'n Save's ban on controversial buttons had not been disparately applied. The NLRB also issued a bargaining order.

## II. DISCUSSION

■ This court will enforce the NLRB's order if the NLRB correctly applied the law and if its findings of fact are supported by substantial evidence on the record as a whole. *Clear Pine Mouldings, Inc. v. NLRB*, 632 F.2d 721, at 724 (9th Cir. 1980).[3]

A. *The Rule Against Controversial Buttons*

■ Although Pay'n Save's employee handbook contained no written regulation concerning buttons or insignia, the company alleges it had a long-standing policy prohibiting employees from wearing political, controversial, or offensive insignia on store jackets. It argues that this policy was meant to avoid the appearance of an endorsement of a controversial position that might offend customers.

This circuit has held that, absent "special considerations," an employee has a right, protected by section 7 of the Act,[4] to wear union buttons and insignia at work. *NLRB v. Essex Wire Corp.*, 245 F.2d 589, 593 (9th Cir. 1957). *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). A later opinion made it clear that this right is not per se guaranteed by the Act; "evidence of a purpose protected by the act" is also required. *NLRB v. Harrah's Club*, 337 F.2d 177 (9th Cir. 1964). In the instant case, the button-wearing was linked to such a protected purpose—the Union's attempt to organize Pay'n Save's employees. Thus Pay'n Save's ban on wearing union buttons interfered with the exercise of a protected right—a violation of section 8(a)(1) of the Act—unless there were special considerations justifying the ban.

The NLRB has found such special considerations, justifying a prohibition on wearing union insignia, in cases where the insignia could exacerbate employee dissension,[5] jeopardize employee safety,[6] or damage machinery or products.[7] The courts have recognized additional "special considerations" —distraction from work demanding great concentration[8] and a need "to project a certain type of image to the public."[9] Only the last of these special factors is even arguably present in the instant case.

---

3. That the NLRB's findings were in part contrary to the ALJ's does not change this standard of review. *NLRB v. Big Bear Supermarkets No. 3,* 640 F.2d 924 at 928 (9th Cir. 1980).

4. Section 7, 29 U.S.C. § 157, guarantees to employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

5. *United Aircraft Corp.*, 134 NLRB 1632 (1961) (reasonable to ban wearing union pins to prevent disorder and divisiveness between strikers and nonstrikers).

6. *Andrews Wire Corp.*, 189 NLRB 108 (1971) (banning union insignia on employees' hard hats was permissible where insignia could impair the hats' visibility and endanger employees).

7. *Campbell Soup Co.*, 159 NLRB 74, *enforced in part, enforcement denied in part on other grounds,* 380 F.2d 372 (5th Cir. 1967).

8. *Fabri-Tek, Inc. v. NLRB*, 352 F.2d 577 (8th Cir. 1965) (manufacture of computer memory units demanded extraordinary concentration, justifying ban on distracting union insignia).

9. *NLRB v. Harrah's Club*, 337 F.2d 177, 180 (9th Cir. 1964) (casino/restaurant could prohibit wearing of union buttons by employees coming into contact with public).

Pay'n Save argues that its ban on union buttons was justified by its legitimate concern about the image projected to the public by its employees and compares its policy to that upheld in *NLRB v. Harrah's Club*, 337 F.2d 177 (9th Cir. 1964). That case, however, is quite different from the present one, since in *Harrah's Club* "the wearing of the union buttons was not part of any concerted campaign to organize the employees" or otherwise to exercise rights protected by the Act, *id.* at 178, and was thus not in itself a protected activity, *id.* at 179. The court's remark, *id.* at 180, that Harrah's concern with "the appearance of its uniformed employees" would in the circumstances of that case have been sufficient justification for prohibiting the buttons even if button-wearing in itself had been a protected right was dictum, unnecessary to the decision of the case.[10]

Pay'n Save also cites the Fifth Circuit's decision in *Davison-Paxon Co. v. NLRB*, 462 F.2d 364 (5th Cir. 1972), which held that a fashionable department store was justified in prohibiting its employees from wearing a large, gaudy union button on the selling floor. The Fifth Circuit noted that the store "was concerned primarily with the button's capacity to antagonize its customers"—the same interest Pay'n Save asserts here. *Id.* at 369. And *Davison-Paxon*, unlike *Harrah's Club*, did uphold a ban on a union button while a union organizing campaign was in progress. Nevertheless *Davison-Paxon* is distinguishable from our case because it involved "animosity between union and anti-union factions at the store" that made the ban on the union buttons reasonable. *Id.* Moreover, *Davison-Paxon* involved a fashionable department store that liked its employees to double as customers and models for its merchandise, *id.* at 368.

Finally, this case is different from either *Harrah's Club* or *Davison-Paxon* because the NLRB found that Pay'n Save had disparately enforced its controversial-button rule against Frederick and Berry.[11] Substantial evidence in the record indicates that, although Pay'n Save had consistently enforced its rule against political buttons, various non-political but potentially controversial buttons had been tolerated on employees' store jackets while the employees were in contact with the public. Buttons with religious messages, religious holiday insignia, and product promotional insignia had been permitted. Moreover, company officials appeared to disagree as to precisely what Pay'n Save's unwritten rule prohibited.[12]

Thus, there is substantial evidence to support the NLRB's finding that Pay'n Save violated section 8(a)(1) of the Act by maintaining and disparately applying a rule against wearing political or controversial

---

**10.** Moreover, *Harrah's Club* would be distinguishable from the instant case even if wearing union buttons were a per se protected right without the need for a link with an otherwise protected purpose. For in *Harrah's*, the court's dictum indicates that the strong employer interest in the image its employees presented to the public would outweigh the weak employee interest in wearing union insignia in the absence of any organizing or collective bargaining activity. In our case the employee interest is much stronger, since an organizing drive *was* under way, and the employer's interest in employee appearance is much weaker, since Pay'n Save's clerks in their bright orange smocks have little in common with the service personnel of a casino/restaurant "on a par with . . . the finest theater-restaurants in the world." 337 F.2d at 178 n.1.

**11.** The court in *Davison-Paxon* explicitly stated that "(t)here is no issue of a discriminatory

motive here." 462 F.2d at 370 n.14. In *Harrah's Club* the employer's rule had "been strictly enforced in the past against badges, pins, and buttons showing religious, political, or social affiliations." 337 F.2d at 178.

**12.** For example, Dale Collette, Pay'n Save's director of training and former personnel director, stated that no buttons were allowed "that would illustrate an endorsement by the company of any type of politics, religion, anything like that"—and that anything worn on the store jackets would constitute an endorsement or promotion by the company. Executive Vice-President Calvin Hendricks spoke of "a controversial political button" as the type banned. And Store Manager Jim Hanrahan testified that "there's no list of what buttons are acceptable" and that he would decide on a case-by-case basis what to permit.

buttons, including union buttons. Pay'n Save has not met its burden of establishing that its policy was justified by "special considerations."[13]

### B. *The Suspensions and Discharges*

█ Given that, absent special circumstances, the wearing of union buttons at work during a union organizational drive is an activity protected under the Act, the illegality of suspending or discharging an employee for wearing a union button is an obvious corollary. Subsection 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate against an employee for engaging in protected union activity.[14]

█ The employer's motivation is controlling in determining whether subsection 8(a)(3) is violated by a discharge or suspension. *Clear Pine Mouldings Inc. v. NLRB*, 632 F.2d 721 at 726 (9th Cir. 1980). The Company argues that Frederick and Berry were disciplined for insubordination, not for engaging in protected union activity. The determination of motive, however, is particularly within the purview of the NLRB. *NLRB v. Fort Vancouver Plywood Co.*, 604 F.2d 596, 600 (9th Cir. 1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980). The NLRB's inferences and findings must prevail where they are reasonable and supported by substantial evidence. *Clear Pine Mouldings, Inc., supra*, 632 F.2d at 726.

█ The NLRB concluded that the Company engaged in unfair labor practices within the meaning of subsections 8(a)(3) and (1) of the Act by suspending and later discharging Frederick and Berry. This conclusion was based upon the uncontradicted evidence the Frederick and Berry were discharged for wearing union buttons on their store jackets during a union organizational drive. There is substantial evidence to support the NLRB's conclusion that the restric-

tion on political campaign buttons was broadened to include all "controversial" buttons in direct response to the Union's activity. Thus, the NLRB's finding that the Company violated section 8(a)(3) and (1) by discharging and suspending Frederick and Berry for wearing union buttons must be upheld.

### C. *The Bargaining Order*

[A] bargaining order can properly be entered where three requirements are satisfied. First, that the union once had a card majority; second, that the employer committed serious unfair labor practices which, though less "outrageous" and "pervasive" than those which by themselves justify a bargaining order, undermine the union's majority and continue to impede the holding of a fair election; and third, that the likelihood of erasing the effects of the unfair practices and obtaining a fair election by the use of traditional remedies is slight and that on balance the employees will best be protected by entry of a bargaining order.

*NLRB v. Peninsula Association for Retarded Children and Adults*, 627 F.2d 202, at 203 (9th Cir. 1980). *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610–16, 89 S.Ct. 1918, 1938–1941, 23 L.Ed.2d 547 (1969). Here, the union clearly had a card majority when ten of the thirteen employees signed union authorization cards. The NLRB found that Pay'n Save's serious misconduct—discharging the leading Union adherents for engaging in protected union activities—tended to dissipate that majority status and made it "practically ... impossible" that a fair election could be held. The NLRB accordingly issued a bargaining order.

█ Pay'n Save urges this court not to enforce the bargaining order, arguing that: (1) the union authorization cards were tainted by Frederick's misrepresentations;

---

**13.** Pay'n Save also contends that it did not in fact ban the union buttons, since employees had the option of wearing such buttons on their own clothing, as Frederick and Berry had done for almost two weeks. The facts belie this contention. Store Manager Hanrahan testified

that he gave Frederick and Berry a choice between discharge and removing their union buttons and that he withdrew the option of wearing the buttons on their personal clothes.

**14.** *See* note 1 *supra*.

(2) Pay'n Save exhibited good faith and a lack of anti-union animus; and (3) twelve employees, on their own initiative, petitioned the NLRB for an election and thereby expressed their opposition to a bargaining order. Deciding whether a bargaining order is warranted, however, is a matter peculiarly committed to the discretion of the NLRB, calling for "its expert estimate as to the effects on the election of the unfair labor practice." *NLRB v. Bighorn Beverages*, 614 F.2d 1238, 1243 (9th Cir. 1980). And a determination that a bargaining order is needed will not be upset if supported by substantial evidence. *Id.* Measured against this strict standard, Pay'n Save's arguments are inadequate.

First, Pay'n Save fails to cast serious doubt on the validity of the union authorization cards. "[E]mployees should be bound by the clear language of what they sign unless that language is clearly and deliberately cancelled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 606, 89 S.Ct. 1918, 1936, 23 L.Ed.2d 547 (1969). The union cards here were entitled "Authorization for Representation." They stated in simple language that the signer authorized the Union to represent him or her for collective bargaining purposes. Pay'n Save did not convince the ALJ or the NLRB that any of the signatures on the cards were obtained by misrepresentations that cancelled this clear wording. The NLRB could properly find majority support for the Union on the basis of the cards signed and returned by employees.

Second, Pay'n Save contends that the NLRB failed to consider the company's good faith and lack of anti-union animus. The Supreme Court in *Gissel*, however, endorsed the NLRB's approach, under which good faith "is largely irrelevant, and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election processes and tend to preclude the holding of a fair election." 395 U.S. at 594, 89 S.Ct.

at 1929. Indeed, the Court in *Gissel* viewed its decision as reinforcing the NLRB's policy of avoiding any inquiry into the employer's state of mind at the time of the unfair labor practices. R. Gorman, *Basic Text on Labor Law 96*.

Finally, Pay'n Save points to a July 1, 1978 petition, signed by twelve employees, as a clear indication that a majority of the store's employees wanted a union election rather than a bargaining order. The petition stated that the employees signed the union cards as a step towards an election rather than as evidence of a decision in favor of the union. Courts have noted, however, the understandable tendency of employees, desiring to retain their jobs and maintain good relations with management after indicating support for a union, to make statements damaging to unions or undermining the validity of union authorization cards they signed. *Gissel, supra*, 395 U.S. at 608, 89 S.Ct. at 1937; *L'Eggs Products, Inc. v. NLRB*, 619 F.2d 1337, 1350 (9th Cir. 1980). Indeed, the NLRB argues persuasively that the petition is strong evidence that the discharge of the two leading Union adherents had a chilling impact upon other Union supporters. We cannot say that the petition should have compelled the NLRB to find a bargaining order unwarranted.

There is substantial evidence to support the NLRB's conclusion that a bargaining order is a proper remedy in this case. "The probable impact of unfair labor practices is increased when a small bargaining unit, such as here, is involved and increases the need for a bargaining order." *NLRB v. Bighorn Beverage*, 614 F.2d 1238, 1243 (9th Cir. 1980) (citations omitted). This case falls within the *Gissel* holding approving the "use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election process." 395 U.S. at 614, 89 S.Ct. at 1940.

D. *The Evidentiary Rulings*

Pay'n Save attacks two evidentiary rulings that were made during the unfair

labor practice hearing before an administrative law judge.

(1) At the hearing, Pay'n Save sought to elicit testimony from Richard L. King, an official of an employer group that negotiates and administers labor contracts for members like Pay'n Save, about conversations with union and NLRB officials that allegedly supported Pay'n Save's claim that it was entitled to discipline employees for wearing union buttons. The ALJ sustained an objection to the testimony. King's testimony was of doubtful relevance: the issue was not how an NLRB official, speaking without authorization or full knowledge of the facts, characterized Pay'n Save's actions, but whether those actions were lawful.

■ (2) The ALJ sustained the relevancy objection to admission of the July 1, 1978 petition discussed earlier. That petition, signed by twelve employees several weeks after the discharge of Frederick and Berry, stated that the employees had signed the union cards only as a step towards an election, not to indicate a decision in favor of the union. Pay'n Save argues that the NLRB should have considered this petition as evidence that a bargaining order was inappropriate. This circuit noted recently that the NLRB may properly disregard attacks on authorization cards made after employer unfair labor practices. *L'Eggs Prods., Inc. v. NLRB*, 619 F.2d 1337, 1350 (9th Cir. 1980).

### CONCLUSION

The NLRB's order is supported by substantial evidence in the record as a whole and the NLRB correctly applied the law. Accordingly, the petition to review and set aside the NLRB's order is dismissed and the order is enforced.